UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

SIMONE CLARKE,

                              Plaintiff,

            -against-

NEW YORK CITY DEPARTMENT OF
EDUCATION, and CLAUDETTE CHRISTIE,

                              Defendants.

**MEMORANDUM & ORDER**
**18-CV-1850 (NGG) (JO)**

NICHOLAS G. GARAUFIS, United States District Judge.

Plaintiff Simone Clarke brings this action against Defendants New York City Department of Education ("DOE") and Claudette Christie after Ms. Clarke was terminated from her position as an Assistant Principal at the World Academy for Total Community Health ("WATCH") High School in Brooklyn. Ms. Clarke asserts claims of (1) sex and pregnancy discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), the New York State Human Rights Law ("NYSHRL"), and the New York City Human Rights Law ("NYCHRL"); (2) a hostile work environment in violation of Title VII, NYSHRL, and NYCHRL; and (3) retaliation against her for reporting the alleged discrimination in violation of Title VII, NYSHRL, and NYCHRL. Now before the court is Defendants' motion for summary judgment. (*See* Mot. for Summ. J. (Dkt. 31); Mem. in Supp. of Defs'. Mot. for Summ. J. ("Mem.") (Dkt. 40); Pl. Mem. in Opp. to Mot. For Summ. J. ("Opp.") (Dkt. 43); Defs.' Reply ("Reply") (Dkt. 45); Pl. Suppl. Reply ("Suppl. Reply") (Dkt. 50).)

For the reasons that follow, Defendants' motion is GRANTED IN PART and DENIED IN PART. Specifically, the motion is granted as to Ms. Clarke's claims of a hostile work environment under Title VII and the NYSHRL and as to claims of retaliation under Title VII, NYSHRL, and NYCHRL. Defendants' motion is denied

1

as to Ms. Clarke's claims of sex and pregnancy discrimination and as to claims of a hostile work environment under the NYCHRL.

## I.   BACKGROUND[1]

In May 2015, Defendant Claudette Christie, the Principal of WATCH High School, hired Ms. Clarke to serve as the Interim Assistant Principal ("AP") for Administration. (Pl. Resp. to Defs'. Local R. 56.1 Statement ("56.1 Resp.") (Dkt. 42) ¶ 16.) Soon after, Ms. Clarke applied to fill the position permanently and she

---

[1]The court constructs the following statement of facts from the parties' Local Rule 56.1 Statements and the admissible evidence they submitted. Except where otherwise noted, the following facts are undisputed. Where the parties allege different facts, the court notes the dispute and credits the Plaintiff's version if it is supported by evidence in the record. All evidence is construed in the light most favorable to the non-moving party with all "reasonable inferences" drawn in its favor. *ING Bank N.V. v. M/V Temara, IMO No. 9333929*, 892 F.3d 511, 518 (2d Cir. 2018).

The court is disappointed that the parties have not resolved fundamental factual disputes about discovery. It takes very seriously Defendants' claim that Plaintiff abused the discovery process, including by strategically editing audio recordings. (*See* Reply at 8.) If a party has knowingly misrepresented facts to the court, that may be the basis for sanctions upon the appropriate motion. *See* Fed. R. Civ. Pro. 11(c); *see also* Fed. R. Civ. Pro. 56(h). The court also takes seriously Plaintiff's contention that Defendants have falsely accused Plaintiff of relying on materials that were not produced in discovery, when, in fact, they were produced by Defendants. (*See* Suppl. Reply at 4.) The court relies on the parties to know and to accurately represent the record. The court credits Plaintiff's representations that she complied with her disclosure obligations during discovery. (*See, e.g.,* Suppl. Reply at 5.) Thus, the court declines to strike any exhibits based on alleged discovery abuses which Plaintiff denies. Of course, crediting Plaintiff's factual assertions does not require the court to accept her legal arguments about the admissibility of any evidence proffered, which the court must always independently determine. *See* Fed. R. Civ. Pro. 56(c). The court only addresses the admissibility of evidence on which it relies. The parties should not take the court's silence on any evidentiary issues raised by Defendants in their reply as an indication that the court agrees with Plaintiff. (*See, e.g.*, Reply at 3-4, 6-7.)

was hired on December 17, 2015. (*Id.* ¶ 23.) Ms. Clarke's probationary, i.e. untenured, employment period was set to expire on May 4, 2020. (*Id.*)

Throughout the summer and the start of the Fall 2015 semester, emails show that Principal Christie expressed dissatisfaction with elements of Ms. Clarke's job performance. In July, she admonished Ms. Clarke for sharing internal information on an email chain where a job candidate was copied. (*See* Emails of July 22-25, 2015 (Dkt. 41-15) at ECF pp. 1-2.) In September, Principal Christie had to make basic grammatical edits to successive drafts of a letter, drafted by a guidance counselor but reviewed and approved by Ms. Clarke, inviting WATCH students and their families to an open-house for a program serving at-risk students. (*See* Emails of Sept. 16-28, 2015 (Dkt. 41-15) at ECF pp. 6-10.) At the bottom of the draft, Principal Christie wrote to Ms. Clarke: "This is the second time I have retuned this letter for editing; please engage in proof-reading before attaching to email; also, note that it is being sent out from an instructional setting. It behooves me that such a simple letter is presenting such problematic editing, especially as it is being *crafted* by educators." (*Id.* at 10 (emphasis in original).) Principal Christie emailed Ms. Clarke that she was behind on conducting teacher evaluations, which Ms. Clarke disputed, and that she failed to keep binders up to date with meeting notes and minutes. (*See* Emails of Sept. 29, 2015 (Dkt. 41-15) at ECF pp. 11-12.) Principal Christie continued to email Ms. Clarke throughout October regarding performance issues. (*See* Emails of Oct. 2015 (Dkt. 41-15) at ECF pp. 14-20.) At other times in the same period, she thanked Ms. Clarke for work well done. (*See* Emails of Principal Christie (Dkt. 44-14).)

According to Ms. Clarke, she informed Principal Christie that she was pregnant in December 2015. (56.1 Resp. ¶ 157.) As evidence, she offers the sworn statement in her verified complaint

before the New York City Commission on Human Rights (Dkt. 44-15) and photographs that show her visibly pregnant, with handwritten dates from November and December 2015. (Dkt. 44-5). Defendants claim that Principal Christie was not aware of Ms. Clarke's pregnancy until February 2, 2016. (56.1 Resp. ¶ 46.) They dispute Ms. Clarke's testimony and characterize her photographic evidence as "unauthenticated" and "suspiciously dated." (Reply at 5-6.)   The court credits Ms. Clarke's version of events for the purpose of deciding the instant motion, but notes that whether Principal Christie was aware of the pregnancy between December 2015 and February 2016 is a significant and contested factual issue.

Around the same time that Ms. Clarke informed Principal Christie that she was pregnant, Principal Christie began to provide harsher and more consistent negative feedback to Ms. Clarke. For instance, on December 22, she wrote in an email: "It is becoming extremely concerning regarding your ability to attend to and complete written reports in a timely manner[,]" before documenting tasks that Ms. Clarke had failed to complete. (Email of Dec. 22, 2015 (Dkt. 44-46) at ECF p. 26.) Principal Christie also expressed concern that Ms. Clarke was "consistently reporting to work anywhere from a minute past to five minutes past [her] official work start time" of 8:00 am. (Email of Jan. 7, 2016 (Dkt. 44-46) ECF p. 28.) She directed Ms. Clarke to begin punching in with a timecard each morning for the following two months. (*Id.*) Ms. Clarke attended a meeting, along with representation from her union, to discuss the directive. (Email of Jan. 30, 2016 (Dkt. 44-52).) At the meeting, she expressed that she felt "defeated, embarrassed, and humiliated" to have to clock in when other employees were not required to. (*Id.*) In response, Principal Christie dropped the timecard requirement but moved Ms. Clarke's start time to 7:45 am. (*Id.*)

Ms. Clarke alleges that during December and January, Principal Christie told her that she was "not working as hard" and was "not as efficient." (56.1 Resp ¶ 158.) She also claims that on two occasions, Principal Christie commented that she was becoming "fat." (*Id.* ¶ 159.) Principal Christie denies making those comments and maintains that she did not know Ms. Clarke was pregnant before February 2016. (*Id.* ¶¶ 48, 82.)

During the Spring 2016 semester, Principal Christie continued to register concerns about Ms. Clarke's job performance. Ms. Clarke allegedly failed to submit professional development logs and calendars, to complete teacher evaluations in a timely manner, to ensure that staff were notified of and attended mandatory training sessions, to schedule interviews for job applicants, or to submit required compliance documents. (*Id.* ¶¶ 56-58.) Principal Christie also reprimanded Ms. Clarke for cancelling a science fair, which she had been directed to organize, without consulting her. (Email of Mar. 29, 2016 (Dkt. 44-36) at ECF p. 46.) Linda Patterson, a professional coach who worked with Ms. Clarke, reported to Principal Christie in April 2016 that "Ms. Clarke could benefit from engaging in purposeful thought about designing and achieving professional goals" but also that a "more transparent alignment between goals and practice" would benefit her. (Email of Apr. 17, 2016 and Log of Assistance (Dkt. 41-19).) Principal Christie also moved Ms. Clarke's start time back to 8:00 am and required her to resume punching in with a timecard. (Letter of Apr. 15, 2016 (Dkt. 44-46) at ECF p. 37.)

According to Ms. Clarke, Principal Christie continued to make derogatory comments about her as a pregnant woman, all of which Principal Christie denies. In March, Principal Christie allegedly told Ms. Clarke that she "didn't like [her] leaning back in her chair and rubbing her belly, gossiping." (56.1 Resp. ¶ 168.) On another occasion, Ms. Clarke alleges that Principal Christie mocked her, rising from her seat in the main office with feigned

difficulty and stating, "[h]ere comes Ms. Clarke now," while rubbing her belly and waddling behind her. (*Id.* ¶ 169.)

Ms. Clarke further alleges that Principal Christie told her in March 2016 that "if you're having issues with your pregnancy, you should take off." (*Id.* ¶ 167.) Principal Christie denies that allegation as well, but at a meeting on May 20, 2016 of which Ms. Clarke made an audio recording, Principal Christie said:

> And that's one of the reasons why I said to you, the other -- when I spoke to you that day, I said, "Ms. Clarke, you're not functioning." And I said, "If you need to take off" -- that's why I said, "If you need to take off", because I think I said to you, "It is better for you to take off and take the time to get yourself together than for me to be constantly writing you up, harassing you, because that jeopardizes your job." Ms. Clarke, I know for me, if I'm not well, you see me was [sic] sick last week? I stayed home. I know I could not function on the job.

(Meeting of May 20, 2016 Tr. ("Meeting Tr.") (Dkt. 46-5) at 21.)[2] The May 20 meeting began with Principal Christie chastising Ms. Clarke for using the restroom before coming to meet with her: "you have your lunch and then, on my time, you go to the bathroom." (*Id.* at 1.) The trip to the restroom, which Ms. Clarke attributed to being eight months pregnant, caused her to be seven minutes late to the meeting. (*Id.*) During the meeting, Ms. Clarke reiterated her frustration that she was not allowed to use the bathroom on the fifth floor, where her office was located, and instead had to take the elevator to the third floor. (*Id.* at 17.)

---

[2] As discussed in note 1, *supra*, the court takes Plaintiff at her word regarding her representations about the complete and forthright production of all discovery materials. In any event, while Defendants registered specific objections to portions of the exhibit, they did not indicate any objection to page 21 of the transcript of the recording. (*See* Reply at 8.)

Principal Christie responded that Department of Education regulations prevented her from allowing Ms. Clarke to use the fifth-floor restroom, which was designated for students. (*Id.* at 19-20.) When Ms. Clarke questioned whether "there are some accommodations that came be made for pregnancy, especially so late[,]" Principal Christie replied, "what do you want me to do? Put a bathroom in your office?" (*Id.* at 19.) She later added, "[d]o you want me to bring the bathroom to you?" (*Id.* at 21.) As the meeting ended, Principal Christie emphasized that she was only concerned with Ms. Clarke's job performance and that Ms. Clarke "used the pregnancy as an excuse" when it was a "personal matter." (*Id.* at 25.)

Principal Christie and Ms. Clarke met again on May 25, 2016, at a meeting attended by Ms. Clarke's union representative. In a letter memorializing the meeting, Principal Christie stated that she reviewed "the unprofessional manner in which [Ms. Clarke] respond[s] to [her] directives including the emotional outbursts, the raising of [Ms. Clarke's] voice, [her] inappropriate responses, and [her] tone." (Letter of June 8, 2016 (Dkt. 44-46) at ECF p. 63.) She advised that if Ms. Clarke failed to change her behavior, it "will lead to further disciplinary actions including termination of services."[3] (*Id.* at ECF p. 64.) Principal Christie asked Ms. Clarke to sign the letter, but Ms. Clarke declined. (NYC Comm'n on Human Rights Verified Compl. ("NYCCHR Compl.") (Dkt. 41-2) ¶ 24.) She also informed Ms. Clarke that she would receive an "Unsatisfactory" ("U") rating on her end-of-year review. (*Id.* at ¶ 25.) On June 7, Ms. Clarke filed a charge of discrimination and retaliation with the New York City Commission on Human Rights ("NYCCHR"). (56.1 Resp. ¶ 3.) Her daughter was born on July 17, 2016. (*Id.* ¶ 81.) Ms. Clarke's verified complaint was served

---

[3] The same language appeared in other letters from Principal Christie to Ms. Clarke regarding her job performance. (*See, e.g.,* Letter of April 15, 2016 (Dkt. 44-46) at ECF p. 37.)

on Principal Christie and DOE on September 2, 2016. (*See* NYC-CHR Letter of Oct. 13, 2016 (Dkt. 44-19).)

During the Fall 2016 semester, Principal Christie continued to document her numerous issues, large and small, with Ms. Clarke's job performance. On September 14 and October 7, she reprimanded Ms. Clarke for leaving a privacy covering on her office window after she had finished pumping breast milk. (Email of Sept. 14, 2016 (Dkt. 44-20); Email of Oct. 7, 2016 (Dkt. 44-25) at ECF p. 3.) Over the course of 31 school days between October 5 and November 22, 2016, Principal Christie wrote 15 emails and four disciplinary letters to file regarding Ms. Clarke's performance. (*See* Opp. at 13-16.) Defendants point to serious allegations contained in Principal Christie's letters, such as "glaring errors" in Individual Education Plans ("IEPs") for Special Education students that Ms. Clarke claimed she missed because she did not review the IEPs for compliance, although that was her responsibility. (*See* 56.1 Resp. ¶¶ 88-89; Letter of Oct. 24, 2016 (Dkt. 41-28) at 1.) Ms. Clarke also claimed to have sent a professional development plan to Principal Christie and her secretary and then later admitted, when confronted, that she had not. (*Id.* ¶ 91-92.) She also failed to submit her annual goals, nearly a month after they were due. (*Id.* ¶ 93.)

In contrast, Ms. Clarke points to a series of complaints that Principal Christie memorialized, in her telling, to build a record against her over picayune gripes. (*See* Opp. at 13.) In one email, for instance, Principal Christie instructed Ms. Clarke that she needed to personally add photos to the school website—after Ms. Clarke had reached out to the only teacher with access to the site to ask for the password—because that teacher had "too much on her plate." (Email of Oct. 8, 2016 (Dkt. 44-26) at ECF p. 2.) In another email, Principal Christie reprimanded Ms. Clarke for submitting documents to her at 5:00 pm instead of "the end of the day," which she stated was 2:30 pm. (Email of Oct. 23, 2016

(Dkt. 44-31) at 2.) Ms. Clarke also claims that Principal Christie's feedback could be "hostile." (Opp. at 13.) In an email sent to Ms. Clarke on a Sunday morning at 6:48 am, Principal Christie wrote: "Once again, I ask that you become reflective in your practice and reframe from deflection." Then, in an email sent at 7:32 am about a separate topic, she followed up: "Once again, Ms. Clarke, Ownership and responsibility of your mistakes." (Email of Oct. 23, 2016 (Dkt. 44-32) at 2; Email of Oct. 23, 2016 (Dkt. 44-30) at 2.) A few days before, Ms. Clarke wrote to her union representative that she and Principal Christie were "having difficulties communicating" and "I feel like I am being harassed." (Email of Oct. 19, 2016 (Dkt. 44-29) at ECF p. 5.) On October 26, Ms. Clarke alleged that Principal Christie was discriminating against her in a complaint to DOE's Office of Equal Opportunity and Diversity Management. (56.1 Resp. ¶ 96.)

Principal Christie continued to advise Ms. Clarke, in writing, of concerns with her professionalism. On November 1, she accused Ms. Clarke of improperly sharing private information from a disciplinary meeting with another member of the school staff and other acts of "insubordination," including that she received a manicure from a cosmetology class when she was supposed to be in a meeting. [4] (Letter of Nov. 3, 2016 (Dkt. 41-31) at 1.) On November 2, she accused Ms. Clarke of being "extremely disruptive" with "loud singing" in school hallways. (Email of Nov. 2, 2016 (Dkt. 44-40).) On November 14, according to Principal Christie, Ms. Clarke approached her after a school cabinet meeting to say that she wished to have a "frank and open conversation" and to "put things on the table" before "they escalate and go higher than both of us where [Principal Christie was] going to have regrets."

---

[4] Ms. Clarke denied that she got a manicure. When showed a picture, she initially claimed it was not her in the photograph. She then admitted that it was her in the photograph but maintained that she was not getting a manicure, but only getting her nails cleaned. (Letter of Nov. 3 at 2.)

(Letter of Nov. 22, 2016 (Dkt. 41-32) at 2.) Principal Christie memorialized the conversation in a letter, writing that "I perceived your statement as a personal threat" and that it was "unprofessional." (*Id.*) The day after Principal Christie's letter, Ms. Clarke emailed her to say that she felt she was "being harassed and interrogated" after Principal Christie criticized her handling of a student disciplinary matter. (Emails of Nov. 23, 2016 (Dkt. 44-43) at ECF p. 2.) In the email chain to which Ms. Clarke was responding, Principal Christie wrote: "Once again, in this matter and all other matters that [sic] you have failed to follow my directives to please follow my directives." (*Id.* at ECF p. 4.)

On December 12, 2016, Principal Christie issued her seventh and final disciplinary letter to Ms. Clarke, in which she accused her of coercing a student into falsifying information regarding a suspension, among other allegations. (Letter of Dec. 12, 2016 (Dkt. 41-33) at 1.) Four days later, Principal Christie emailed Ms. Clarke with more negative feedback, including that she failed to manage the school's laboratory inventory and that "I have often times seen you searching for your keys stating that you 'can't find them.'" (Emails of Dec. 16, 2016 (Dkt. 44-45).) Ms. Clarke forwarded the email to her union representative, alleging that Principal Christie was citing "falsehoods" that never occurred. (*Id.*) Soon after, Ms. Clarke's employment was placed under review and she was discontinued as an Assistant Principal on January 23, 2017. (*See* Letters of Dec. 23, 2016 (Dkt. 44-48) and Jan. 23, 2017 (Dkt. 44-51).)

In November 2017, NYCCHR sent a Notice of Administrative Closure and the United States Equal Employment Opportunity Commission notified Ms. Clarke of her right to sue on January 18, 2018. (*See* Notices of NYCCHR and EEOC (Dkt. 41-4).) Ms. Clarke commenced this lawsuit by filing a complaint on March 27, 2018. (Compl. (Dkt. 1).)

## II.  LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Pro. 56(a). "The role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried. In determining whether summary judgment is appropriate, this [c]ourt will construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011).[5]  "A 'material' fact is one capable of influencing the case's outcome under governing substantive law, and a 'genuine' dispute is one as to which the evidence would permit a reasonable juror to find for the party opposing the motion." *Figueroa v. Mazza*, 825 F.3d 89, 98 (2d Cir. 2016) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The movant may discharge its initial burden by demonstrating that the non-movant "has 'failed to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Lantheus Med. Imaging, Inc. v. Zurich Am. Ins. Co.*, 225 F. Supp. 3d 443, 451 (S.D.N.Y. 2015) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986)).

While the court must draw all inferences in favor of the non-movant, the non-movant "may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995). In considering the Defendants' motion, the court is mindful that the Second Circuit "has long recognized the need for caution about granting summary judgment to an employer in

---

[5] When quoting cases, and unless otherwise noted, all citations and quotation marks are omitted and all alterations are adopted.

a discrimination case where . . . the merits turn on a dispute as to the employer's intent." *Walsh v. New York City Hous. Auth.*, 828 F.3d 70, 74 (2d Cir. 2016). Nevertheless, "[t]hough caution must be exercised in granting summary judgment where intent is genuinely in issue, summary judgment remains available to reject discrimination claims in cases lacking genuine issues of material fact." *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 40 (2d Cir. 1994).

## III. DISCUSSION

### A. Pregnancy Discrimination

Title VII, as amended by the Pregnancy Discrimination Act of 1978, the NYSHRL, and the NYCHRL all prohibit discrimination against employees on the basis of sex, which includes pregnancy discrimination. *See* 42 U.S.C. § 2000e(k); N.Y. Exec. Law § 296(1)(a); N.Y.C. Admin Code § 8-107.[6] "Claims brought under New York State's Human Rights Law are analytically identical to claims brought under Title VII." *Rojas v. Roman Catholic Diocese of Rochester,* 660 F.3d 98, 107 n. 10 (2d Cir. 2011). Claims under the NYCHRL must be analyzed "separately and independently from any federal and state law claims" because federal and state statutes "can serve only as a floor below which the City's Human Rights law cannot fall." *Mihalik v. Credit Agricole Cheuvreux North America. Inc.*, 715 F.3d 102, 109 (2d Cir. 2013).

---

[6] Although Ms. Clarke makes claims under Title VII against Defendants (plural), the federal statute does not allow for individual liability, and it cannot be applied to Principal Christie. *See Marchuk v. Faruqi & Faruqi, LLP*, 100 F. Supp. 3d 302, 307 (S.D.N.Y. 2015). To the extent that Principal Christie can face liability under the NYSHRL and NYCHRL on a theory of "aiding and abetting" pursuant to N.Y. Exec Law § 296(6) and N.Y.C. Admin. Code. § 8-107(1)(a), those claims are considered in Section III.D. *infra.*

Title VII claims are analyzed under the burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Walsh*, 828 F.3d at 74-75. At the first step, the plaintiff must establish a prima facie case of discrimination by showing: (1) that she belonged to a protected class; (2) that she was qualified for the employment position she held; (3) that she suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent. *Holcomb v. Iona Coll.*, 521 F.3d 130, 138 (2d Cir. 2008). If the plaintiff succeeds in making out a prima facie case, a presumption of discrimination arises and the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action. *Id.* If the defendant proffers such a reason, the plaintiff "has the opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 123 (2d Cir. 2004). To meet this burden, "the plaintiff may, depending on how strong it is, rely upon the same evidence that comprised her prima facie case, without more." *Id.* at 124. Furthermore, to defeat summary judgment, "the plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the 'motivating' factors." *Id.* at 123.

Ms. Clarke has easily met the "minimal requirements" to make out a prima facie case of discrimination. *See James v. N.Y. Racing Ass'n*, 233 F.3d 149, 153-154 (2d Cir. 2000). First, she belongs to a protected class. Second, when she was hired, she had over 15 years of experience as an educator, including two stints as an interim Assistant Principal at WATCH and another high school. (56.1 Resp. ¶¶ 12, 18.) Third, Ms. Clarke suffered two adverse employment actions: she was terminated from her position and

13

she received a "U" rating, which made her ineligible for per session overtime work that she had previously performed. (*See* 56.1 Resp ¶ 177; *Demoret v. Zagarelli*, 451 F.3d 140, 151 (2d Cir. 2006) (finding adverse action where, *inter alia*, plaintiff was "not allowed to earn overtime pay").) Fourth, Ms. Clarke has established that the circumstances surrounding those adverse employment actions give rise to an inference that Principal Christie acted with discriminatory intent. Ms. Clarke testified that Principal Christie told her that she was "not working as hard" and was "not as efficient" when she became pregnant. She also testified that Principal Christie encouraged her to take time off because pregnancy was preventing her from performing her job, comparing pregnancy to an illness—comments corroborated by Principal Christie in a subsequent audio recording. Those comments alone are sufficient to shift the burden to Defendants for the second stage of the *McDonnell-Douglass* inquiry. *See Back*, 364 F.3d at 124 ("[E]vidence of discriminatory comments, which can constitute 'direct evidence,' [] are adequate to make out a prima facie case, even where uncorroborated.").

Similarly, Defendants have easily met their burden to rebut Ms. Clarke's prima facie case with legitimate, nondiscriminatory reasons for the adverse employment actions taken against her. *See McDonnell Douglas*, 411 U.S. at 802. Principal Christie carefully documented a pattern of chronic lateness, inattention to detail—particularly with respect to compliance with Special Education requirements—and failure to follow instructions or to work collaboratively with her. Ms. Clarke does not contest that Defendants met their burden at this stage.

The court proceeds to the third step to consider whether Ms. Clarke has "produced evidence sufficient to permit a rational finder of fact to infer that [Defendants'] decision was more likely than not based in part on discrimination." *Walsh*, 828 F.3d at 76. At this step, the court looks at the evidence as a whole, just as a

juror would. *Id.* Ms. Clarke claims that, at least partially for discriminatory reasons, Principal Christie targeted her with constant and often unfair criticism to justify removing her from her position. Looking at all of the evidence, the court finds that a reasonable juror could agree with her, depending on how certain factual disputes are resolved.

First, a reasonable juror, if crediting Ms. Clarke's version of events over Principal Christie's denials, could find evidence of discriminatory intent in Principal Christie's direct statements and conduct. *See Back,* 364 F.3d at 121 (holding comments that comported with the stereotype that "work and motherhood are incompatible" were sufficient to show discriminatory intent and to defeat Defendant's motion for summary judgment). Soon after learning of Ms. Clarke's pregnancy, Principal Christie allegedly told Ms. Clarke she was "not working as hard," that she was "not as efficient," and that she was "fat." Principal Christie also mocked Ms. Clarke for "rubbing her belly" and imitated her, in front of her colleagues, by exaggeratedly waddling. Moreover, Principal Christie's anger that Ms. Clarke used the restroom rather than immediately report to her office for their May 20 meeting, and her dismissive response to Ms. Clarke's request for a reasonable accommodation from DOE's regulation to allow her to use a restroom near her office, could lead a reasonable juror to conclude that Principal Christie had a derogatory view of Ms. Clarke because of her pregnancy. *See Zambrano-Lamhaouhi v. New York City Bd. of Educ.,* 866 F. Supp. 2d 147, 171 (E.D.N.Y. 2011) ("[H]ostility to Plaintiff as her due date approached, particularly in connection with her frequent bathroom breaks—a common issue for pregnant women—could be seen by a jury as evidence of a view that pregnant women lacked diligence or require undue accommodation."). These incidents could all reasonably lead to the conclusion that Principal Christie believed that Ms. Clarke's pregnancy was an obstacle to her professional performance. Principal Christie confirmed as much when she

suggested that Ms. Clarke take time off from work because, like an illness, pregnancy rendered her unable "to function on the job." Examining Principal Christie's words and deeds, a reasonable juror might find evidence of the familiar stereotype, oft recognized by courts, that pregnant women are unfit for employment. *Id.* at 171 (collecting cases and secondary sources).

Second, Ms. Clarke allegations demonstrate a temporal proximity between her pregnancy and the circumstances that led to her "U" rating and termination. *See Briggs v. Women in Need, Inc.*, 819 F. Supp. 2d 119, 128-129 (E.D.N.Y. 2011). As Defendants point out, Principal Christie began to give Ms. Clarke negative feedback before her pregnancy. However, the tone and frequency of Principal Christie's negative comments noticeably escalated in December 2015, after Principal Christie allegedly became aware of Ms. Clarke's pregnancy. In earlier emails, Principal Christie focused on specific tasks, for instance specific meeting minutes that were missing (*see* Email of Sept. 29, 2015 (Dkt. 44-46) at ECF p. 17), or teacher observations that Ms. Clarke needed to complete, (*see* Email of Oct. 24, 2015 (Dkt. 44-46) at ECF p. 20). Beginning in December, however, Principal Christie began to comment on Ms. Clarke's performance generally and began to memorialize concrete dates and times of unsatisfactory work. (*See* Email of Dec. 23, 2015 (Dkt. 44-46) at ECF p. 26.) A reasonable juror could conclude that before December 2015, Principal Christie wrote emails to give Ms. Clarke feedback, while after, she wrote to document allegations for Ms. Clarke's employment file. *See, e.g., Back*, 365 F.3d at 124 ("a jury could find that the administrative deficiencies cited by the defendants were minor, and unimportant to the defendants before the development of the purported discriminatory motive"); *United States v. New York City Dep't of Educ.*, 407 F. Supp. 3d 365, 395 (S.D.N.Y. 2018) (finding evidence of intent to constructively discharge teachers where school principal was "intentionally building a record of unsatisfactory observation reports in order to oust" them). In addition,

on January 7, within weeks of learning about Ms. Clarke's preg-
nancy, Principal Christie met with her to discuss her recurring
lateness —which Defendants characterized as "the most critical
issue with [Ms. Clarke's] performance" at the time of the meet-
ing—and to require her to use a timecard to punch in daily. (*See*
NYCHCR Verified Ans. (Dkt. 41-3) ¶ 35.) Temporal proximity be-
tween pregnancy and an adverse employment action cannot, on
its own, support a finding of discriminatory intent. *See Briggs*,
819 F. Supp. 2d at 128. Here, however, Principal Christie's dis-
criminatory comments coincided with her efforts to document
Ms. Clarke's alleged performance deficiencies which could sup-
port an inference, based on their timing, that Principal Christie's
documented concerns with Ms. Clarke were at least partially pre-
textual.

Finally, in their conversation on May 20, Principal Christie
acknowledged the link between Ms. Clarke's pregnancy and the
persistent negative feedback when she stated: "It is better for you
to take the time to get yourself together than for me to be con-
stantly writing you up, harassing you, because that jeopardizes
your job . . . I know for me, if I'm not well, you see me [sic] was
sick last week? I stayed home. I know I could not function on the
job." (Meeting Tr. at 21.) Then and now, Principal Christie de-
nied that her assessment of Ms. Clarke's job performance had
anything to do with her pregnancy. However, given the numer-
ous derogatory comments that Principal Christie made; the
temporal proximity of Principal Christie learning of Ms. Clarke's
pregnancy and those comments, as well as the outset of more
pointedly negative feedback; and Principal Christie's suggestion
that a pregnancy, like an illness, could keep an employee from
functioning on the job, the court cannot say, as a matter of law,
that discriminatory animus was not at least a motivating factor
in the adverse employment actions taken against Ms. Clarke. In
addition, Principal Christie maintains that a number of Ms.

Clarke's allegations simply did not occur. Thus, questions of material fact exist as to Ms. Clarke's Title VII claims and summary judgment would be inappropriate. Likewise, Ms. Clarke's claims of discrimination under NYSHRL which is coextensive with Title VII, and NYCHRL which is less stringent than Title VII, must advance to trial.

### B. Hostile Work Environment

#### 1. Title VII and NYSHRL

To make out a hostile work environment claim under Title VII, the plaintiff must present evidence (1) that the conduct in question was "objectively severe or pervasive," that is, that it created an "environment that a reasonable person would find hostile or abusive"; (2) that the plaintiff subjectively perceived the environment as hostile or abusive; and (3) that the plaintiff was subject to the hostile work environment "because of" her sex. *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007). On the first prong, the "plaintiff need not show that her hostile working environment was both severe and pervasive; only that it was sufficiently severe or sufficiently pervasive, or a sufficient combination of these elements, to have altered her working conditions." *Pucino v. Verizon Comms., Inc.*, 618 F.3d 112, 119 (2d Cir. 2010). Hostile work environment claims under the NYSHRL are coextensive with Title VII. *Davis-Bell v. Columbia Univ.*, 851 F. Supp. 2d 650, 670 (S.D.N.Y. 2012).

No single incident alleged here would qualify as sufficiently "severe" to sustain Ms. Clarke's hostile work environment claim. *See, e.g., Sardina v. United Parcel Serv., Inc.*, 254 F. App'x 108, 110 (2d Cir. 2007) (summary order) ("[A] few off-color comments including references to 'office bitches' and 'Brooklyn bimbettes' … do not rise to the level of an objectively hostile work environment.") Rather, Ms. Clarke's contends that she was subject to a daily barrage of criticism, sometimes for infractions of no significance or which did not occur, along with the directly

18

discriminatory comments and conduct alleged. A plaintiff must clear a high bar in order to assert a hostile work environment claim based on "intense scrutiny" from a supervisor. *See Zambrano-Lamhaouhi*, 866 F. Supp. 2d at 174 (denying summary judgment where defendant made plaintiff perform duties outside of her contract; did not excuse her from hallway and cafeteria duty, despite her pregnancy; subjected her to intense scrutiny, including of her bathroom usage, and "yelled" at her for using the bathroom; expressed "disdain" for plaintiff; and prevented her from attending a teacher development course); *but see Nugent v. St. Lukes–Roosevelt Hosp. Ctr.*, 303 F. App'x. 943, 945 (2d Cir. 2008) ("derogatory language," "dismissive comments," and "intense scrutiny" insufficient to make out hostile work environment claim); *Colon v. Fashion Inst. of Tech. (State Univ. of New York)*, 983 F. Supp. 2d 277, 292 (S.D.N.Y. 2013) (intense scrutiny and micro-management on a daily basis insufficient to make out hostile work environment). "Allegations of even constant reprimands and work criticism by themselves are not sufficient to establish a hostile environment claim." *Lucenti v. Potter*, 432 F. Supp. 2d 347, 362 (S.D.N.Y. 2006).

Principal Christie's criticism of Ms. Clarke was at times unrelenting and needlessly personal. However, with a handful of exceptions, Principal Christie confined herself to discussing Ms. Clarke's job performance. The other comments, such as calling Ms. Clarke fat and imitating her rubbing her belly and waddling, are too sporadic to sustain a hostile work environment claim on their own. *See Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002) ("As a general rule, incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive."). As such, Defendants are entitled to summary judgment on Ms. Clarke's hostile work environment claims under Title VII and the NYSHRL.

2. NYCHRL

In contrast to Title VII and the NYSHRL, the NYCHRL does not require conduct to be severe or pervasive in order to sustain a hostile work environment claim at the summary judgment stage and "even a single comment may be actionable in appropriate circumstances." *Gorokhovsky v. New York City Hous. Auth.*, 552 F. App'x 100, 102 (2d Cir. 2014) (summary order). As such, on an NYCHRL hostile work environment claim, the court must determine only whether "there is a triable issue of fact as to whether the plaintiff has been treated less well than other employees because of" her membership in a protected class. *Davis-Bell*, 851 F. Supp. 2d at 671. Given Principal Christie's specific comments about Ms. Clarke's body and ability to meet her work obligations while pregnant, and given the intensity of the scrutiny applied to her, it would be inappropriate to grant summary judgment under the NYCHRL which is to "be construed liberally for the accomplishment of [its] uniquely broad and remedial purposes." N.Y.C. Admin. Code § 8–130(a). Defendants' motion for summary judgment on Ms. Clarke's hostile work environment claim under the NYCHRL is therefore denied.

**C. Retaliation**

Title VII provides that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). Claims for retaliation under Title VII, and under the corresponding provisions of the NYSHRL, are analyzed under the *McDonnell Douglas* framework. *See Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*, 716 F.3d 10, 14 (2d Cir. 2013) ("The standards for evaluating . . . retaliation claims are identical under Title VII and the NYSHRL.").

Under the NYCHRL, a plaintiff "need only show the employer's conduct was reasonably likely to deter a person from engaging in protected activity." *Husser v. N.Y.C. Dep't of Educ.*, 137 F. Supp. 3d 253, 274 (E.D.N.Y. 2015).

To state a prima facie claim for retaliation, a plaintiff must demonstrate that (1) she engaged in protected activity; (2) the employer was aware of that activity; (3) the employee suffered a materially adverse action; and (4) there was a causal connection between the protected activity and that adverse action. *Kelly*, 716 F.3d at 14. A causal connection between protected activity and a retaliatory adverse action may be established either: "(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000).

Ms. Clarke first filed a notice of discrimination with the New York City Commission on Human Rights on June 7, 2016 and Defendants were served with that notice and her verified complaint on September 2, 2016. (*See* NYCCHR Letter of Oct. 13, 2016 (Dkt. 44-19).) Defendants claim, without any authority, that no events prior to October 26, 2016—when Ms. Clarke filed her complaint with the DOE's Office of Equal Opportunity—can serve as the basis for a retaliation claim. (Mem. at 19.) However, documentary evidence clearly shows that they were served on September 2, 2016 with Ms. Clarke's verified complaint in which she states, "Respondents violated Title VII of the Civil Rights Act of 1964." (NYCCHR Compl. ¶ 29). The Law Department is expected to know the record and to cite to evidence and authority if it believes that the record is misleading or has been mischaracterized. Based on the facts as discussed, Ms. Clarke has met her minimal

burden to make a prima facie case, and Defendants have prof-fered sufficient nondiscriminatory explanations to rebut and shift the burden back to her.

Ms. Clarke's retaliation claims fail at the third step of the *McDonnell Douglass* inquiry, however. Ms. Clarke filed her first complaint with the NYCCHR on June 7. (56.1 Resp. ¶ 3.) That day, Principal Christie met with Ms. Clarke and told her that she would receive a "U" rating for the 2015-16 school year. (*Id.* ¶ 73.)[7] The following day, Principal Christie drafted a disciplinary letter to file stating that she had addressed Ms. Clarke's alleged unprofessionalism at prior meetings in March, April, and May. (*See* Letter of June 8, 2016 (Dkt. 44-46) at ECF pp. 63-64). The precise timing of events on June 7 are crucial and potentially dis-positive facts. Defendants claim that Principal Christie informed Ms. Clarke that she would receive a "U" rating before Ms. Clarke filed her complaint with the Commission. (*See* Mem. at 19.) Ms. Clarke addressed the timing of her complaints and subsequent actions in her memorandum but failed to contest that key fact. (*See* Opp. at 13.) The court therefore accepts Defendants' version of events; as such, it would be impossible for Ms. Clarke's "U" rating to have been given in retaliation for a complaint that was unknown to Principal Christie or to the DOE at the time. *See Gordon,* 232 F.3d at 117.

To the extent that Ms. Clarke argues that the negative feedback she received from Principal Christie after June 7, 2016 was retal-iation for her protected activity, those claims are unpersuasive. When Ms. Clarke returned to work for the Fall 2016 semester, Principal Christie began to send nearly daily emails and letters about her performance. However, there is not sufficient evidence

---

[7] Ms. Clarke's formal evaluation, which set out the reasons for her "U" rating in writing came on June 23. (56.1 Resp. ¶ 78.)

that Principal Christie's behavior towards Ms. Clarke was mean-
ingfully different after her complaint than it was before. As
discussed, Principal Christie subjected Ms. Clarke to intense scru-
tiny that began well before June 7, 2016, when Ms. Clarke made
her first complaint. Because Ms. Clarke does not point to any di-
rect or circumstantial evidence to show the requisite causal link
between her protected activities and subsequent actions against
her, Defendants are entitled to summary judgment on all of her
retaliation claims.

### D.  Aiding and Abetting

Unlike Title VII, "an individual defendant with supervisory con-
trol" may be held personally liable under the aiding and abetting
provisions of both the NYSHRL and NYCHRL if she "actually par-
ticipates in the conduct giving rise to a discrimination claim."
*Tomka v. Seiler Corp.*, 66 F.3d 1295, 1317 (2d Cir. 1995); *see also*
*Feingold v. New York*, 366 F.3d 138, 158 (2d Cir. 2004) ("The
same standards of analysis used to evaluate aiding and abetting
claims under the NYSHRL apply to such claims under the NY-
CHRL because the language of the two laws is virtually
identical"); *Griffin, Michael Godwin v. Sirva, Inc.*, 29 N.Y.3d 174,
187 (2017) ("Section 296(6) extends liability to persons and en-
tities beyond joint employers, and this provision should be
construed broadly."). Here, to the extent that Ms. Clarke's claims
of sex and pregnancy discrimination under the NYSHRL and NY-
CHRL move forward, as well as her claims of a hostile work
environment under the NYCHRL, Principal Christie may also face
personal liability under the relevant aiding and abetting provi-
sions.

## IV.  CONCLUSION

For the foregoing reasons, Defendants' (Dkt. 31) Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART. The parties are DIRECTED to contact the chambers of Magistrate Judge James Orenstein concerning the next steps in this case.

SO ORDERED.

Dated:      Brooklyn, New York
            October 13, 2020

                                              /s/ Nicholas G. Garaufis
                                            NICHOLAS G. GARAUFIS
                                            United States District Judge